## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 31 2016, 8:16 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Mark J. Crandley
Barnes & Thornburg LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEES

John A. Kraft
Young, Lind, Endres & Kraft
New Albany, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

James Albert Costello and Lisa Renee Costello,

*Appellants-Plaintiffs,*

v.

Wayne Zollman and Teresa Zollman,

*Appellees-Defendants.*

May 31, 2016

Court of Appeals Case No. 10A05-1503-PL-97

Appeal from the Clark Circuit Court

The Honorable Joseph P. Weber, Judge

Trial Court Cause No. 10D03-0901-PL-1

**Robb, Judge.**

# Case Summary and Issues

[1] James and Lisa Costello appeal from the trial court's judgment against them in their action against Wayne and Teresa Zollman regarding a dispute over the ownership of land in Clark County, Indiana. The Costellos raise five issues for our review, which we consolidate and restate as (1) whether the trial court's decision declaring the Zollmans acquired title to the property by adverse possession is clearly erroneous; (2) whether the trial court's decision awarding the Zollmans damages is clearly erroneous; and (3) whether the trial court's decision rejecting the Costellos' claim for trespass is clearly erroneous. We conclude the trial court did not err in finding the Zollmans gained title to the property by adverse possession. However, we further conclude the trial court erred in awarding the Zollmans damages and in rejecting the Costellos' claims for trespass. Therefore, we affirm in part, reverse in part, and remand.

# Facts and Procedural History[1]

---

[1] The Brief of Appellees contains a few errors and we take this opportunity to remind counsel of our appellate rules. Appellate Rule 46(B) requires an appellee's brief conform with Appellate Rule 46(A) with certain exceptions inapplicable here. First, Rule 46(A)(5) requires the Statement of Case include citations to the Record on Appeal or Appendix. Here, the Statement of Case does not contain a single citation to the record or the appendix. Second, Rule 46(A)(6)(a) requires the Statement of Facts be "supported by page references to the Record on Appeal or Appendix . . . ." Here, the Statement of Facts does not contain a single citation to the record or the appendix. Third, Rule 46(A)(8) requires the party's contentions "be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on . . . ." Here, the Argument section is replete with factual assertions lacking proper citation. Considering the size of the record and the case's complexities, the failure to properly cite to the record has made this Court's task that much more difficult. Finally, Rule 43(E) states, "All text shall be double-spaced, except that footnotes, tables, charts, or similar material and text that is blocked and indented shall be single-spaced." Here, the text of the brief is not double-spaced.

[2] The Costellos and the Zollmans live on neighboring lands in Clark County, Indiana. The Costello Real Estate is immediately west of, and runs adjacent to, the Zollman Real Estate. At some point prior to 1957, a fence ("Fence") was constructed between the two properties. It is unknown who constructed the Fence. In the 1960s, Verlon and Myrtle Morgan owned the Zollman Real Estate and the Zollmans began renting the Zollman Real Estate for the purpose of hunting and farming. During this time, Wayne believed the Fence acted as the boundary line between the northeastern portion of the Costello Real Estate and the southwestern portion of the Zollman Real Estate ("Historical Fence Line"). Over the next several years, Wayne often repaired the Fence for the Morgans. In 1978, the Morgans conveyed fee simple title in the Zollman Real Estate to the Zollmans. Over the next five years, the Zollmans used the land immediately east of the Fence ("Disputed Property") for farming; the Disputed Property does *not* include the Fence. In 1983, the Zollmans built additional fencing on the Disputed Property and attached it to the Fence in order to contain their farm animals.

[3] In 1993, Lisa's parents purchased the Costello Real Estate and the Costellos often resided on the property. At the time, Lisa did not know whether the Fence acted as the legal boundary line between the two properties but did not observe the Zollmans housing animals on the Disputed Property. In 1997, Lisa's parents deeded Lisa fee simple title in the Costello Real Estate. Shortly thereafter, Lisa observed the Zollmans stored piles of lime dust near the Zollman's barn, which is located 100 feet east of the Fence.

[4] At some point over the next several years, the Zollmans again attached additional fencing to the Fence to enclose their animals. The Costellos claimed the Zollmans' animals damaged the Fence, began entering the Costello Real Estate, and required the Costellos to often fix and replace portions of the Fence. Around the same time, a cluster of thirty-one trees located on the Costello Real Estate and immediately west of the Fence started "to die and rot out" at the base; no other trees on the Costello Real Estate were rotting or dying. Transcript at 28. Lisa removed the dead trees, leaving only stumps. Lisa then had samples of the soil surrounding the tree stumps tested by an environmental laboratory. The results indicated an increased pH level in the soil.

[5] In 2003, Lisa employed the Clark County Surveyor, Robert Isgrigg, to conduct a retracement survey in order to determine the boundary line between the Costello Real Estate and the Zollman Real Estate ("2003 Survey"). The survey revealed the entire length of the Fence was located on the Costello Real Estate, the Costello Real Estate included a portion of the Disputed Property, and a strip of land immediately east of the "true" boundary line was unowned. In other words, portions of the Disputed Property were either a part of the Costello Real Estate or unowned.

[6] At some point, the Township Trustee removed and replaced a portion of the Fence. The cost was assessed against the Costellos' property taxes. In October 2005, the Costellos filed a complaint against Wayne and several township

officials, including the Township Trustee. [2] In his answer, Wayne asserted a counterclaim against the Costellos, alleging the lawsuit was frivolous and requesting attorney's fees. After the parties participated in mediation, the Costellos dismissed their claims against the township officials in consideration of a $1,815.00 payment, but did not settle their claims against Wayne.

[7] In 2009, Lisa employed another environmental laboratory to take a sample of the soil surrounding the tree stumps along the Fence and test the soil's pH level; the results showed the pH had returned to normal. On September 10, 2010, Lisa again employed Isgrigg to conduct a legal survey ("2010 Survey"). On October 13, 2010, Isgrigg returned to the properties and ultimately adopted his 2003 Survey findings, specifically stating the entirety of the Fence was located on the Costello Real Estate, the Costello Real Estate extended approximately 1.33 feet into the Disputed Property, and a 5.88-foot-wide strip of land further east was unowned. On the same day, Isgrigg recorded the survey at the Clark County Surveyor's Office.

[8] In May 2011, the Costellos filed a complaint amending their 2005 complaint. In August 2011, the Costellos filed a Third Amended Complaint for Damages and Request for Declaratory Judgment and added Teresa as a defendant. Specifically, the complaint requested the trial court adopt the findings of the 2010 Survey and declare the Costellos the owners of the Disputed Property,

---

[2] The initial complaint is not a part of the record, but based on the trial court's findings, it appears the Costellos sued the Township Trustee for trespass relating to the construction of that portion of the Fence.

award damages to the Costellos under a theory of common law trespass, and award treble damages and attorney's fees under a theory of criminal trespass pursuant to Indiana Code section 34-24-3-1.[3]  The Zollmans' answer did not include any counterclaims.

[9] After the parties participated in discovery, a bench trial was held in August 2014.  Prior to trial, the Zollmans made a motion for specific findings of fact and conclusions, which the trial court granted.  Also prior to trial, Lisa removed the Fence.  Following the trial, each party submitted its proposed findings of fact and conclusions.  The Zollmans' proposed findings included findings that Lisa committed criminal trespass in removing the Fence and that the Zollmans were entitled to treble damages in the amount of $5,850.00.  On October 28, 2014, the trial court entered a general order stating the Zollmans held title to the Disputed Property, the Costellos were not entitled to damages, and the Zollmans were entitled to a personal judgment against the Costellos in the amount of $1,950.00 for damages suffered by the removal of the Fence.  However, the trial court did not enter specific findings of fact and conclusions.

---

[3] The Costellos alleged numerous acts of trespass.  However, on appeal, the Costellos only challenge the trial court's finding that the Zollmans committed trespass in storing lime dust piles near the Fence thereby allowing "toxic chemicals and harmful herbicides to flow" onto the Costello Real Estate.  Appellants' Appendix at 30.

After the Costellos filed a motion to correct error, the trial court adopted the

Zollmans' proposed findings and conclusions verbatim[4]:

[*Findings of Fact*]

6. The Zollmans, prior to their purchase of the Zollman Real Estate leased the same from their predecessors Verlon Morgan and Myrtle Morgan from the mid to late sixties until they purchased the same in 1978, and occupied and farmed all the property over to a fence which was observed by Zollmans and their predecessors as the common boundary line with the Costello Real Estate.

7. [P]rior to Lisa removing the fence between the Costello Real Estate and the Zollman Real Estate in April, 2014 the fence remained at that same location—in fact the fence was the original basis for this litigation when the "boundary fence" was constructed by the Township Trustee pursuant to Indiana's fence law (I.C. 32-26-9 et. seq.).

8. The current litigation originally commenced on October 20, 2005, between Costello and other named Defendants, including the Owen Township Trustee, Leroy Graebe and the Clark County Auditor, Barbara Bratcher-Haas, concerning a fence line constructed by the Township Trustee in accordance with [the fence law] . . . .

9. On October 5, 2009 Costello, in consideration of a payment of $1,815.00 by the County, dismissed all parties, except Wayne Zollman and waived any claim of trespass of the Township Trustee relating to the fence erection. The fence constructed by the Trustee was along the historically observed boundary line between Costello and Zollman.

10. The fence erected by the Township Trustee no longer exists

---

[4] There is no signed order in the record containing the trial court's findings. Rather, the trial court only entered a lengthy recitation of its findings in the Chronological Case Summary. For this reason, we will cite to the Zollmans' proposed findings contained within the Appellants' Appendix.

as Lisa Renee Costello removed the same in April, 2014, as well as portions erected and paid for by the Zollmans.

* * *

23. Wayne Zollman farmed the Zollman Real Estate . . . since the mid to late 60's and continuously occupied that in some manner since that date. Zollman occupied and controlled the Zollman Real Estate, either through the leasing of the Zollman Real Estate to farm or his ownership, and the same was all the way over to the fence, as it had historically existed when he first entered the property in the mid 60's.

24. Zollman testified the historical fence had never been moved from its location since he occupied the Zollman Real Estate through lease or ownership until Lisa removed the same in April, 2014.

* * *

26. Zollman repaired and replaced the fence through the time period they occupied the property. Zollman paid taxes on all of the real estate during the time period of their ownership from 1978 forward and had not been delinquent with the taxes and believed in good faith the taxes paid included all real estate over to the historic fence observed as the boundary line.

27. Zollman entered into evidence photographs reflecting the removal of the fencing by Costello. Said photos depicted the holes that would identify the historic line. Zollman also showed photos of the historic fence line and old fence post with rusted woven wire that is not even made anymore. Zollman testified Costello destroyed this fence line, removing all fenceposts, including all historical markers and all posts and woven wire he had replaced and paid for. Lisa admitted to the removal of the posts and cutting of Zollmans' woven wire, and to taking the posts and fencing.

28. The taking by Lisa was wrongful.

29. Zollman testified, without objection, the cost to replace the posts would be at Eighteen and No/100 ($18.00) Dollars per post and spaced at appropriate intervals would require fifty (50) posts or Nine Hundred and No/100 ($900.00) Dollars; woven wire of One Thousand Fifty and No/100 ($1,050.00) Dollars plus labor

and latches; and the Court finds it strikingly coincidental this amount is only about One Hundred ($100.00) Dollars different than what the County paid to Costellos in the settlement of the underlying action in 2009.

30. The posts which Zollman placed in are currently wrongfully in the possession of the Costellos and the Costellos had destroyed his woven wire fence by cutting the same off of the posts.

* * *

39. One of Costello's counts was for damages relating to "toxic chemicals and harmful herbicides" flowing from the Zollman Real Estate to the Costello Real Estate, and to support such claim Costello produced Gregory Mills (hereinafter Mills), a certified arborist to appraise trees alleged to have been removed from the Costello Real Estate.

40. Mills could have done an analysis, rather than an appraisal, to determine issues and/or causes of tree damage, but Lisa had requested he only appraise the trees (or what was left of rotted trees) on the Costello Real Estate. Mills indicated an analysis would have determined the actual cause, or would have narrowed the cause of the loss of the trees. He was not asked to do that so he could only speculate as to what caused the trees to die, and this was done over the objection of Zollmans' counsel.

41. [O]ver the objection of Zollmans' counsel Mills speculated the damage may have been caused from lime dust on the Zollman Real Estate, but on cross examination when shown pictures entered into evidence of rotted stumps of trees alleged to be on the Costello Real Estate from the late 90's or early 2000's he recanted on what may have caused damage to the trees.

* * *

43. Costello presented no evidence of "toxic chemicals" or "harmful herbicides" only speculation concerning lime dust.

44. At the conclusion of presentation of evidence, the Zollmans moved to amend the pleadings to conform to the evidence presented.

[*Conclusions*]

10. The survey conducted by Robert Isgrigg is not a "legal survey" and does not establish the boundary line between the Costello Real Estate and the Zollman Real Estate, thus, the claims of trespass by Costello premised on the same must fail.

* * *

12. On its face the survey conducted by Robert Isgrigg it [sic] states it is a "retracement survey" defined as being "a survey of real property that has been previously described in documents conveying an interest in real property."

13. The Surveyor's Report on the Isgrigg retracement survey at Note #6 states in pertinent part, "However, a plat is recorded in Misc. Record 22-3147, which shows a fence at that time (1-10-1957), is the line, creating some uncertainty." The fence referred to by Note #6 is the historical fence showing it even existed in 1957, prior to the Zollmans leasing the same for farming in the 60s.

14. Zollmans are entitled to all lands east of the historic fence line by adverse possession.

* * *

18. There was no evidence presented to dispute the testimony of Wayne Zollman that he had paid the taxes on his real estate since 1978 and that he believed in good faith he was paying taxes of [sic] all real estate east of the historical fence.

* * *

20. Zollmans' title to all the Zollman Real Estate over to the historical fence was established and vested in 1988, prior to Costello, or her parents, ever taking title to the Costello Real Estate in 1993.

21. In addition to proving Zollmans showed they believed in good faith they had paid the taxes, they can also satisfy the intent or notice requirements—and did exercise control over the land as required for every adverse possession claim. In the 2003 . . . retracement survey the fence remained at its historical location, and is so noted—Costello did nothing in 2003 to dispute the fence as being the boundary line.

22. Costello never excluded Zollmans from using all of the Zollman Real Estate east of and over to the historical fence line,

and Zollmans did it openly—even the Costello pictures put into evidence from the late 90's early 2000's reflect the historical fence line, and its location.

23. Zollmans exercised control of all portions to the east of the historical fence line, and Zollmans (and their predecessors), prior to Lisa taking title, had already established the requisite elements for adverse possession for more than the requisite time period of ten (10) years.

24. Once title vests at the conclusion of the ten-year possessory period, the title may not be lost, abandoned, or forfeited . . . even when the party agrees to a survey to attempt to find the true boundary line.

25. Zollmans are entitled to damages for the replacement of the fence removed by Costello, and the wrongful taking of the Zollmans' property.

26. I.C. 34-24-3-1 provides for recovery of damages for one that suffers a pecuniary loss as the result of I.C. 35-43 up to three (3) times the amount of actual damages and a reasonable amount to compensate for loss of time to file papers and attend court proceedings.

27. The actions of Lisa removing and destroying the fence of the Zollmans violate I.C. 35-43-2-2.

Appellants' App. at 53-66 (emphasis and citations omitted). This appeal ensued.

# Discussion and Decision

## I. Standard of Review

[10] Where, as here, the trial court enters special findings and conclusions thereon pursuant to Indiana Trial Rule 52(A), our standard of review is well-settled:

First, we determine whether the evidence supports the findings and second, whether the findings support the judgment. In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment. We do not reweigh the evidence, but consider only the evidence favorable to the trial court's judgment. Challengers must establish that the trial court's findings are clearly erroneous. Findings are clearly erroneous when a review of the record leaves us firmly convinced a mistake has been made. However, while we defer substantially to findings of fact, we do not do so to conclusions of law. Additionally, a judgment is clearly erroneous under Indiana Trial Rule 52 if it relies on an incorrect legal standard. We evaluate questions of law de novo and owe no deference to a trial court's determination of such questions.

*Kwolek v. Swickard*, 944 N.E.2d 564, 570 (Ind. Ct. App. 2011) (emphasis and citation omitted), *trans. denied*.

## II. Adverse Possession

[11]   The Costellos contend the trial court erred in concluding the Zollmans proved the elements of adverse possession by clear and convincing evidence.

[T]he doctrine of adverse possession entitles a person without title to obtain ownership to a parcel of land upon clear and convincing proof of control, intent, notice, and duration, as follows:

(1) Control—The claimant must exercise a degree of use and control over the parcel that is normal and customary considering the characteristics of the land (reflecting the former elements of "actual," and in some ways "exclusive," possession);

(2) Intent—The claimant must demonstrate intent to claim full ownership of the tract superior to the rights of all others, particularly the legal owner (reflecting the former elements of "claim of right," "exclusive," "hostile," and "adverse");

(3) Notice—The claimant's actions with respect to the land must be sufficient to give actual or constructive notice to the legal owner of the claimant's intent and exclusive control (reflecting the former "visible," "open," "notorious," and in some ways the "hostile," elements); and,

(4) Duration—the claimant must satisfy each of these elements continuously for the required period of time (reflecting the former "continuous" element).

*Fraley v. Minger*, 829 N.E.2d 476, 486 (Ind. 2005). The requisite period of time for adverse possession is ten years. *Celebration Worship Ctr., Inc. v. Tucker*, 35 N.E.3d 251, 254 (Ind. 2015). In addition to the elements noted above, our legislature imposes a requirement that an "adverse possessor pay[] all taxes and special assessments that the adverse possessor reasonably believes in good faith to be due on the real property during the period the adverse possessor claims to have adversely possessed the real property." Ind. Code § 32-21-7-1(a). "[O]nce a party establishe[s] the elements of adverse possession, fee simple title to the disputed tract of land is conferred upon the possessor by operation of law, and title is extinguished in the original owner." *Knauff v. Hovermale*, 976 N.E.2d 1267, 1270 (Ind. Ct. App. 2012) (citation and internal quotation marks omitted).

[12] The Costellos first argue the evidence does not support the trial court's findings regarding the notice and intent elements.[5] Specifically, the Costellos contend after they moved onto the Costello Real Estate in 1993, the Zollmans neither used the Disputed Property nor took action to exclude the Costellos from the Disputed Property. Such contentions, however, carry no weight considering the trial court concluded the Zollmans established adverse possession of the Disputed Property in 1988—five years prior to the Costellos first occupying the Costello Real Estate. Wayne testified he began farming the Disputed Property in 1978. In 1983, Wayne ceased farming on the Disputed Property, connected additional fencing to the Fence, and began housing animals on the Disputed Property. In addition, Wayne testified the Fence remained on the Historical Fence Line from 1978 until Lisa removed the Fence in 2014. We conclude the trial court's conclusions that the Zollmans satisfied the notice and intent elements are not clearly erroneous.

[13] The Costellos also argue the trial court's conclusion that the Zollmans satisfied the tax payment requirement is clearly erroneous. In concluding the Zollmans satisfied the requirement, the trial court found "Zollman paid taxes on all of the real estate during the time period of their ownership from 1978 forward and had not been delinquent with the taxes and believed in good faith the taxes paid included all real estate over to the historic fence observed as the boundary

---

[5] The Costellos do not challenge whether the evidence supports the trial court's findings in regard to the control and duration elements.

line[,]" Appellants' App. at 57, and "[t]here was no evidence presented to dispute the testimony of Wayne Zollman that he had paid the taxes on his real estate since 1978 and that he believed in good faith he was paying taxes of [sic] all real estate east of the historical fence[,]" *id.* at 65. The Costellos acknowledge Wayne testified he paid taxes on the Zollman Real Estate since 1978 and he believed such taxes included the taxes on the Disputed Property, but argue the Zollmans did not present evidence indicating their tax obligation actually included the taxes on the Disputed Property. Brief of Appellants at 25. However, such evidence is not needed to support a finding of compliance with Indiana Code section 32-21-7-1(a).

[14] In *Celebration Worship Center*, a property dispute arose between a church and neighboring homeowners; the church owned lot 3, and immediately to the east, the homeowners owned lot 4. The church filed a complaint to determine the boundary line between lots 3 and 4 and attached to the complaint a survey indicating the boundary line extended to the edge of a gravel driveway along the eastern border of lot 3. In their answer, the homeowners argued "they had acquired title to the disputed real estate—the grassy portion along the east side of lot 3 contiguous to the west side of lot 4 (their side yard) and the 'edge of the gravel'—by adverse possession . . . ." 35 N.E.3d at 253. In their motion for summary judgment, the homeowners designated sworn affidavits indicating they believed in good faith the taxes they had always paid on lot 4 included all of the grassy portions of the yard over to the gravel's edge; the homeowners also designated county tax records showing no tax arrearages on lot 4. The trial

court concluded the homeowners satisfied the tax requirement for the statutory time period and granted summary judgment to the homeowners. In affirming the trial court's decision, our supreme court stated,

> [T]he homeowners in the present case argue they and their predecessor have paid all taxes that they reasonably believed in good faith to be due on the disputed real estate because they believed the disputed real estate to be part of the side yard of their lot 4—for which they *actually* paid taxes. This reasonable and good faith belief substantially complies with the statutory tax payment requirement.

*Id.* at 255 (emphasis in original).

[15] Similar to *Celebration Worship Center*, Wayne testified under oath he began paying taxes on the property in 1978, he believed he owned the Disputed Property, he had a good faith belief he continually "pa[id] taxes on every bit of" the Disputed Property, and those taxes had never been delinquent. Tr. at 262. Such evidence is sufficient to show the Zollmans substantially complied with the tax requirement. *See Celebration Worship Ctr.*, 35 N.E.3d at 255. In addition, the Costellos have not cited to any evidence in the record rebutting this conclusion. Therefore, we conclude the evidence supports the trial court's findings regarding the Zollmans' satisfaction of the tax payment requirement.

Accordingly, the trial court's conclusion that title to the Disputed Property vested in the Zollmans by adverse possession in 1988 is not clearly erroneous.[6]

[16] Although title to the Disputed Property vested in the Zollmans in 1988, there is no evidence indicating the Zollmans held title to the Fence. Specifically, the Fence was constructed prior to 1957 and there is no evidence indicating who originally constructed the Fence, but *both* parties testified to making repairs to the Fence. The surveys conducted by Isgrigg do not show the Fence acted as a boundary fence or a partition fence between the two properties; rather, the surveys indicate (1) the entirety of the Fence rested upon the Costello Real Estate, and (2) the Costello Real Estate extended into the Disputed Property east of the Fence prior to 1988 when the Zollmans gained title to the Disputed Property. The Zollmans did not admit into evidence their own survey showing they held title in the Fence and the Disputed Property, which is likely why they claimed title to the Disputed Property by adverse possession. Further, we note

---

[6] The Costellos also challenge the trial court's findings regarding the deficiencies in Isgrigg's 2010 Survey. Specifically, they argue the trial court erred in allowing the Zollmans to collaterally attack the 2010 Survey and in concluding the 2010 Survey did not satisfy the statutory requirements of a legal survey. Regardless of whether the 2010 Survey met the statutory requirements set forth in Indiana Code section 36-2-12-10 and regardless of whether the Zollmans could collaterally attack the validity of the 2010 Survey, title to the Disputed Property vested in the Zollmans as a matter of law in 1988 and such title cannot be lost, abandoned, or forfeited by a subsequent legal survey. *See Fraley*, 829 N.E.2d at 487 (noting once an individual gains title to property by adverse possession, the title may not be abandoned, lost, or forfeited, "even where the party pays rent to the titleholder, agrees to a survey to attempt to find the true boundary line, expresses satisfaction with a survey whose results are inconsistent with the property adversely possessed by him, or states that he does not claim the land and offers to buy it"); *see also Snowball Corp. v. Pope*, 580 N.E.2d 733, 734 (Ind. Ct. App. 1991) ("Once a party has acquired title through adverse possession, that party does not lose title based upon acts committed or circumstances existing after title is established."). As a result, we need not address the merits of the legal survey issues.

the fact the Township Trustee constructed a portion of the Fence does not dictate that this Fence portion is a boundary fence when faced with other evidence: the surveys indicate it was constructed on the Costello Real Estate, the Costellos sued the Township Trustee for trespass, the Township Trustee settled the suit against it and paid the Costellos $1,815.00, and the Costellos testimony that it always believed the Fence was on the Costello Real Estate. Accordingly, there is no evidence in the record to contradict the Costellos' position that the Fence, including the portion erected by the Township, rested entirely upon the Costello Real Estate. Because the Zollmans only gained title to the Disputed Property by adverse possession, we conclude the Zollmans did not have a property interest in the Fence.

## III. Costellos' Claims of Trespass

[17] The Costellos argue the trial court erred in concluding the Zollmans did not commit common law or criminal trespass in allowing lime to flow onto the Costello Real Estate. The trial court only entered four findings relevant to the Costellos' trespass claim:

> 40. Mills could have done an analysis, rather than an appraisal, to determine issues and/or causes of tree damages, but Lisa had requested he only appraise the trees (or what was left of rotted trees) on the Costello Real Estate. Mills indicated an analysis would have determined the actual cause, or would have narrowed the cause of the loss of the trees. He was not asked to do that so he could only speculate as to what caused the trees to die, and this was done over the objection of Zollman's counsel. 41. [O]ver the objection of Zollmans' counsel Mills speculated the damage may have been caused from lime dust on the

Zollman Real Estate, but on cross examination when shown pictures entered into evidence of rotted stumps of trees alleged to be on the Costello Real Estate from the late 90's or early 2000's he recanted on what may have caused damage to the trees.

42. Zollman makes his living at farming and testified the appropriate ideal PH [sic] level for soil to farm is at a level equivalent to that as shown by Costello to be harmful.

43. Costello presented no evidence of "toxic chemicals" or "harmful herbicides" only speculation concerning lime dust.

Appellants' App. at 61. The Costellos argue the trial court's findings are clearly erroneous because Mills did not speculate, but rather testified in his professional opinion the piles of lime dust on the Zollman Real Estate ran off downhill towards the trees, thereby raising the pH levels in the soil surrounding the trees and causing the trees to die.

[18]    Indiana Code section 35-43-2-2 provides the elements of criminal trespass:

> (b) A person who:
>> (1) not having a contractual interest in the property, knowingly or intentionally enters the real property of another person after having been denied entry by the other person or that person's agent;
>> (2) not having a contractual interest in the property, knowingly or intentionally refuses to leave the real property of another person after having been asked to leave by the other person or that person's agent;
>> * * *
>> (4) knowingly or intentionally interferes with the possession or use of the property of another person without the person's consent;
>> * * *
> commits criminal trespass . . . .

At common law, a plaintiff bringing a trespass action must establish two elements: (1) the plaintiff must show he possessed the land when the alleged trespass occurred, and (2) the plaintiff must demonstrate the alleged trespasser entered the land without legal right. *Holland v. Steele*, 961 N.E.2d 516, 525 (Ind. Ct. App. 2012), *trans. denied*. It is a general rule of tort law that

> [o]ne who recklessly or negligently, or as a result of an abnormally dangerous activity, enters land in the possession of another or causes a thing or third person so to enter is subject to liability to the possessor if, but only if, his presence or the presence of the thing or the third person upon the land causes harm to the land, to the possessor, or [to] a thing or a third person in whose security the possessor has a legally protected interest.

*Lever Bros. Co. v. Langdoc*, 655 N.E.2d 577, 582 (Ind. Ct. App. 1995) (quoting Restatement (Second) of Torts § 165 (1965)).

In *Lever Brothers Company*, a residential landowner brought suit under a trespass theory after heavy rains flooded the landowner's basement and the landowner observed a white fatty substance floating in the water. On appeal, we were tasked with determining whether a trespass could occur as a result of the entry of noxious materials onto another's property. Despite no Indiana case previously considering the issue of whether the entry of noxious material onto another's property could constitute a trespass, we agreed with other jurisdictions which found a trespass could occur if there was a direct causal relation between the actor's conduct and the intrusion of the *foreign matter* upon the possessor's land that caused the harm. *See id.*

[20] At trial, Wayne acknowledged piles of lime dust were located on the Zollman Real Estate for the purpose of disinfecting the barn. Shortly after purchasing the Costello Real Estate in 1997, Lisa observed the piles of lime dust near the Zollman's barn. Lisa testified certain trees located on the Costello Real Estate near the Fence and downhill from the Zollmans' barn began to die in the late 1990s and early 2000s. At some point unclear from the record, the trees died and began to rot, and Lisa opted to remove the trees leaving only the stumps. Thereafter, Lisa took samples of the soil surrounding the tree stumps. Around 2004, Lisa had the samples tested by Sure Tech Laboratories ("Sure Tech"). Around 2009, Lisa employed A&L Analytical Laboratories ("A&L") to take and test soil samples. Sometime after 2010, Lisa provided the results of the Sure Tech and A&L testing to Mills to assist him in assessing the value of the tree loss. The Costellos did not admit the reports into evidence.

[21] Mills, an International Society of Arboriculture certified arborist, testified the field of arboriculture focuses on all facets of plant care, including the plant's soil, which Mills indicated contributes to a plant's health. Mills claimed arborists also conduct landscape evaluations, which requires the arborist to appraise the value of a tree. When Mills arrived at the Costello Real Estate, Lisa had already removed the dead trees. Mills then measured the tree stumps to get an appraisal, as Lisa requested; Mills did not need to know the cause of the trees' death to conduct an appraisal. During trial, however, the Costellos asked Mills if, based on the results of the laboratory testing, he formed an opinion in regard to the soil composition. The trial court overruled the

Zollmans' objection to this questioning, but noted a continuing objection. Mills then testified the 2004 Sure Tech results indicated a high level of pH in the soil and the 2009 A&L results indicated the pH level returned to normal.

> [Costellos:] So the condition that you recognize relative to the pH in the Sure Tech results, what types of things could cause that?
> [Mills:] Uh, anything with limestone in it. Gravel, agriculture lime, there's a lot of things that could cause it but we always drop back to it being some deviant of lime. You know there are different forms of lime. There's basic aglime, there's maglime but that's [sic] all just has to do with how finely the stuff's [sic] ground up. It's still lime in the end.

*Id.* at 113-14. The Costellos asked Mills whether a lime dust pile located outside of the Zollmans' barn could pose a risk to trees:

> [Mills:] Well it depends if it's uphill or downhill from it you know runoff.
> [Costellos:] Okay how about Mrs. Costello's trees?
> [Mills:] Well Mrs. Costello's trees, yes Sir because they were downhill from it.
> [Costellos:] Okay and would uh a runoff from that lime pile be a cause for the soil conditions that you recognized?
> [Mills:] It certainly can be.
> [Costellos:] Can be?
> [Mills:] Sure.
> [Costellos:] Is it?
> [Mills:] Yes it is.
> [Costellos:] Can you say with any degree of certainty?
> [Mills:] Uh rain water dissolves lime.
> [Costellos:] I'm sorry. Pardon me?
> [Mills:] I said rain water dissolves lime and lime stone. You see rocks wear from rain fall.

* * *

[Costellos:] Have you formed any professional opinion about the cause of the pH levels in the soil on Costello's land?
[Mills:] Yes.
[Costellos:] And that cause being?
[Mills:] Well the increased soil pH would be the only possible causal changing factor is the pile of lime dust.
[Costellos:] And your basis for that conclusion is?
[Mills:] Simple, uphill, downhill, raining water goes downhill. I've never seen water run uphill yet.
[Costellos:] Is that conclusion uh, impacted at all by the location of the stumps that you saw relative to the topography of the—
[Mills:] It's not impacted by it, it's the whole reason for it.
[Costellos:] Now just to be clear Mr. Mills—
[Mills:] Okay.
[Costellos:] A second ago you said "could be" but then I asked you, "is it" and I guess you clarify for us whether that, how much speculation is involved?
[Mills:] Very little speculation.

*Id*. at 117-18.

[22]     At the outset, we note the trial court adopted the Zollman's proposed findings verbatim and such a practice "weakens our confidence as an appellate court that the findings are the result of considered judgment by the trial court." *Cook v. Whitsell-Sherman*, 796 N.E.2d 271, 273 n.1 (Ind. 2003). As noted above, the trial court only entered four findings relevant to Costello's common law and criminal trespass claims and much of those findings pertain to Mills' "speculation" as to the cause of the trees' deaths and the lack of evidence showing lime is a harmful or toxic material. We acknowledge the evidence supports the findings that Lisa only hired Mills to appraise the trees, but we

cannot conclude the evidence supports the remaining findings. At trial, it was undisputed the Zollmans stored lime dust piles near their barn, the trees were downhill from the barn, the Costellos had never used lime on their property, lime increases the pH levels in soil, and high pH levels harm trees. Based on these undisputed facts, the laboratory results Lisa provided to Mills, and Mills' experience as a certified arborist, Mills concluded—in his professional opinion—there was a causal connection between the lime on the Zollman Real Estate and the death of the Costellos' trees. *See Lever Bros. Co.*, 655 N.E.2d at 582. Because we conclude the trial court's findings are clearly erroneous, coupled with the fact the trial court made no other findings pertaining to the issue, we remand to the trial court to enter further findings on this issue consistent with the evidence presented.

# Conclusion

[23] The Zollmans gained title to the Disputed Property east of and up to the Fence in 1988 as a matter of law. However, because the Fence rested entirely upon the Costello Real Estate and there is no evidence the Zollmans maintained a property interest in the Fence, the Zollmans did not gain title to the Fence when they gained title to the Disputed Property and their claim of trespass entitling them to damages for removal of the Fence fails. As to the Costellos' claim of trespass, the evidence does not support the trial court's findings regarding the testimony of Mills, who testified in his professional opinion to a direct causal connection between the Zollmans' lime dust piles and the death of the

Costellos' trees.  Accordingly, we affirm in part, reverse in part, and remand to the trial court with instructions.

[24] Affirmed in part, reversed in part, and remanded.

Barnes, J., and Altice, J., concur.